## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE, AT KNOXVILLE

| | | |
|---|---|---|
| LADD LANDING, LLC; MATT C. CALDWELL, JR.; MARIE CORINA CALDWELL; BRENTWOOD, LTD; BROWDER HARDWARE, INC.; BROWDER HARDWARE OLD CAPITOL TOWN, LLC; JOSEPH M. CALDWELL; MICHAEL CALDWELL; MERENDIA CALDWELL; EDWARD L. CHASTEEN; TERESA CALDWELL CHASTEEN; THE CITIZENS NATIONAL BANK OF ATHENS, TENNESSEE; PATRICK C. COOLEY; ROBERT L. DELANEY; AMANDA DELANEY MILLER; RICHARD K. EVANS; CELIA SIMON; EYE CENTERS OF TENNESSEE, LLC; FOIL WYATT PARTNERSHIP; MIKE FOIL; BOWDEN WYATT; J. BAKER HAMILTON; KARI HAMILTON; HIGHLAND RESERVE, LLC; KRA, LLC; LARRY E. PATTERSON PROPERTIES, LLC; LEC PROPERTIES; WILLIAM E. LINDSEY; NINTH JDA, LLC; OLD CAPITOL TOWN, LLC; P.C.G., INC. d/b/a PIONEER CONSTRUCTION GROUP; PIONEER REALTY and ASSOCIATES; R.P. BEARD & SON, INC.; ROBERT NEIL SCALF; SEAN D. STEPHENS; SEAN D. STEPHENS & ASSOCIATES, LLC; MATT C. CALDWELL, JR. d/b/a STOWERS FOREST; VILLAGES OF CENTER FARM LP, a/k/a CENTERBURY, LP; THE VILLAS CONDOMINIUM ASSOCIATION ON PARCEL BC-9; BC-4 PROPERTIES CONDOMINIUM ASSOCIATION, INC.; WATERFRONT PLANTATION, LLC; WL&MC DEVELOPMENT, LLC; GARY M. WOLFE; and WORLDWIDE INTERACTIVE NETWORK, INC., | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | DEMAND FOR JURY TRIAL<br><br><br><br>CASE NO. _____ |
|                    Plaintiffs,<br>   v.<br>TENNESSEE VALLEY AUTHORITY,<br>           Defendant. | | |

## COMPLAINT

# I.   **INTRODUCTION**

1.       Plaintiffs, Ladd Landing, LLC; Matt C. Caldwell, Jr.; Marie Corina Caldwell; Brentwood, Ltd.; Browder Hardware, Inc.; Browder Hardware Old Capitol Town, LLC; Joseph M. Caldwell; Michael Caldwell; Merendia Caldwell; Edward L. Chasteen; Teresa Caldwell Chasteen; The Citizens National Bank of Athens, Tennessee; Patrick C. Cooley; Robert L. Delaney; Amanda Delaney Miller; Richard K. Evans; Celia Simon; Eye Centers of Tennessee, LLC; Foil Wyatt Partnership; Mike Foil; Bowden Wyatt; J. Baker Hamilton; Kari Hamilton; Highland Reserve, LLC; KRA, LLC; Larry E. Patterson Properties, LLC; LEC Properties; William E. Lindsey; Ninth JDA, LLC; Old Capitol Town, LLC; P.C.G., Inc. d/b/a Pioneer Construction Group; Pioneer Realty and Associates; R.P. Beard & Son, Inc.; Robert Neil Scalf; Sean D. Stephens; Sean D. Stephens & Associates, LLC; Matt C. Caldwell, Jr. d/b/a Stowers Forest; Villages of Center Farm, LP a/k/a Centerbury, LP; The Villas Condominium Association on Parcel BC-9; BC-4 Properties Condominium Association, Inc.; Waterfront Plantation, LLC; WL&MC Development, LLC; Gary M. Wolfe; and Worldwide Interactive Network, Inc., file this Complaint against Tennessee Valley Authority ("TVA") for injuries to their businesses and property caused by the TVA's preventable release of over 1 billion gallons of coal sludge from an impoundment at its Kingston Fossil Plant into the environment on December 22, 2008 ("12/22").

2.       The United States Environmental Protection Agency has said that the disaster at Kingston is the worst environmental disaster of its type and TVA's own CEO, Tom Kilgore, has called it a "catastrophe."

3.       The quantity of coal sludge that was spilled into the environment was three times the amount of oil spilled in the Gulf of Mexico after the Deepwater Horizon exploded.

3.     The quantity of coal sludge that was spilled into the environment was three times the amount of oil spilled in the Gulf of Mexico after the Deepwater Horizon exploded.

4.     The coal ash impoundment was in the exclusive control of TVA at all relevant times.

5.     TVA operated the impoundment under an NPDES permit which required it to "properly operate and maintain all facilities and systems for collection and treatment, and expressly prohibits overflows of wastes to land or water from any portion of the collection, transmission, or treatment systems other than through permitted outfalls." EPA Administrative Order, Docket No. CERCLA-04-2009-3766.

6.     In the years leading up to the disaster, among other things, TVA failed to properly construct, maintain and inspect the impoundment, or to train its employees in the applicable policies and procedures regarding the maintenance of the coal ash impoundment at the Kingston Fossil Plant (commonly known as the Kingston Steam Plant, Kingston Fossil Plant, or "KIF"). The Court, in related actions, has found that these acts were non-discretionary acts for which TVA can be held liable.

7.     The catastrophic spill was foreshadowed by a string of prior near misses at the Kingston facility. TVA nevertheless continued its course of conduct, ignoring these red flags.

8.     TVA's long history of flagrant disregard for safety was done with willful, wanton and reckless indifference to the disastrous results that were sure to follow.

9. TVA's flagrant disregard for safety and the environment, and the people of Kingston, is consistent with TVA's corporate culture, where accountability is passed on from one person to the next but never accepted.

10. Also consistent with this corporate culture, in the related action TVA has adamantly denied liability, claiming that none of its non-discretionary acts caused the disaster or any damages. This denial of liability is simply another example of TVA's unwillingness to be accountable and accept responsibility for the catastrophe.

11. Because TVA continues to deny any responsibility for the catastrophe and continues to deny that it caused any damage to Plaintiffs, a liability trial in related matters was held before this Court between September 19, 2011 and October 12, 2011. Throughout the trial, TVA denied that there was anything that it could have done to prevent the disaster.

12. Indeed, TVA hired an expert witness, William Walton, to testify that there was a "slime layer" that TVA could not have known about that was the trigger for the failure. Even if this were true, which Plaintiffs dispute, the impoundment was in TVA's control at all times and there was nothing preventing TVA from discovering the so-called "slime layer" at any time prior to the disaster. Indeed, if TVA had properly maintained, inspected, and constructed the impoundment, it would have determined the nature of the foundation of the impoundment and would have detected any problems, including the existence of any so-called "slime layer."

13. Plaintiffs maintain that the "slime layer" was predetermined in order to provide TVA with an excuse so that it could refuse to accept responsibility for its conduct.

14. TVA's own Inspector General concluded that "Tagging the 'slime layer' as the triggering mechanism for the Kingston Spill is fortuitous" and "suspect" because TVA sought to use it to allow management to avoid accountability. OIG Report at 18.

15.     Marshall Miller, who was retained by the TVA OIG, and Plaintiffs'

expert, Dan Marks, said that even if the slime layer was potentially associated with the failure, it

was only associated, if at all, along with other probable root causes of equal or greater

significance.

16.     Mr. Walton even admitted in his trial testimony that the build up of water

within the dike was what triggered Mr. Walton's "slime layer" to trigger the failure.

17.     TVA's OIG concluded that TVA had management problems that resulted

in the spill, including: "(1) a failure to implement recommended corrective actions that could

possibly have prevented the Kingston Spill; (2) the lack of policies and procedure; (3) poor

maintenance; (4) the lack of specialized training; (5) multiple organizational structure changes;

(6) inadequate communication; and (7) a failure to follow engineering best practices." OIG

Report at 31.

18.     Coal waste contains corrosive, carcinogenic, radioactive, hazardous,

and/or toxic materials, including lead, mercury, arsenic, thallium, beryllium, boron, cadmium,

chromium, manganese, molybdenum, nickel, selenium, and zinc. The catastrophe unleashed

these toxins into the environment.

19.     Miles of river were closed to fishing, swimming and boating to facilitate

the "clean up" of the ash.

20.     Still, ash remains in the water and on the bottom of the river, and can

never be fully cleaned up. TVA has acknowledged this fact.

21.     Plaintiffs, many of whom depended on the appeal of the Watts Bar

Reservoir to attract those seeking to live near the water for their livelihood, were financially

vulnerable to TVA's conduct.

946848.4

22.     Instead of being known as a peaceful and beautiful retirement and recreation destination, Kingston is now much better known as ground zero of the largest environmental catastrophe in the United States.

23.     The substantial investments that Plaintiffs have made in Kingston and in the local real estate market there have been destroyed.

24.     The catastrophe has caused, and continues to cause, devastating environmental damage and has caused Plaintiffs millions of dollars in damage to their income, business, and property.

25.     TVA constructed, owned, maintained, operated and inspected the impoundment, and bears full responsibility for the disaster and the damages it has caused.

26.     TVA's conduct leading up to the disaster was negligent, reckless, willful and wanton, and in complete disregard for the health, safety and property of Plaintiffs and their community.

27.     As a result of TVA's wrongful actions, Plaintiffs' properties have been physically marred, contaminated, stigmatized and/or rendered valueless or drastically reduced in value, either permanently or temporarily, if not wholly destroyed.  Plaintiffs' businesses that rely on the value and appeal of the area's real property have been decimated.  This suit therefore seeks monetary damages for the diminution of the value Plaintiffs' real properties, financial losses of their businesses, and for the loss of use and/or enjoyment of property suffered by Plaintiffs.

28.     The release of the coal ash sludge, which is a solid waste as defined in the federal Solid Waste Disposal Act and/or Resource Conservation and Recovery Act ("RCRA")

946848.4

and Tennessee state law, constitutes a reckless, intentional and/or illegal disposal of solid waste on the properties of Plaintiffs and in publicly used areas, including navigable waterways.

29.     The impoundment and/or continued impoundment of coal ash sludge waste at KIF is an illegal, open dump of solid waste in violation of state and/or federal law, including RCRA.

30.     TVA's release of the coal ash sludge and/or other wastes also violates other federal environmental laws, including the Clean Water Act, and Tennessee state law, including the Tennessee Water Quality Control Act.

## II.     JURISDICTION.

31.     Plaintiffs are owners of businesses and real property in the vicinity of the TVA KIF facility.

32.     This Court has original federal question jurisdiction over claims against TVA pursuant to 28 U.S.C. §§ 1331, 1337.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District and a substantial part of property that is the subject of the action is situated in this District.  TVA has substantial contacts in the Eastern District of Tennessee, as its principal executive offices are located in Knoxville.  TVA's Kingston Fossil Plant is located in the city of Kingston in Roane County, Tennessee, and is thus located within the geographical boundary of the Eastern District of Tennessee.

## III.     PARTIES.

33.     Plaintiff Ladd Landing, LLC is a Tennessee limited liability corporation with its headquarters in Kingston, Tennessee.  Ladd Landing, LLC is a land development business focused on development of property starting on October 21, 2000.  Ladd Landing, LLC

946848.4

is a Planned Community located approximately 1.8 miles from the coal ash spill, as depicted below:



Ladd Landing, LLC owns property located at Centers Ferry Road (Tax Map/Parcel 47-03300-000); Ladd Landing Common Area (Tax Map/Parcel Number 047L B 004.00-000); 2.57 acres-Sheerwater Road (Tax Map/Parcel 048J A 009.00-000); BC1 – Waterford Place (Tax Map/Parcel 047L B 003.00-000); BC5 – Ladd Landing Boulevard (Tax Map/Parcel 047 33.07-000); BC8 – Fleet Street (Tax Map/Parcel 047 033.09-000); Lot 1 Ladd Landing Boulevard (Tax Map/Parcel 048P B 008.00-000); Kings Close Lot 31 (Tax Map/Parcel Number 048I B 013.00-000); Kings Close Lot 32 (Tax Map/Parcel Number 048I B 012.00-000); Kings Close Lot 42 (Tax Map/Parcel Number 048I B 002.00-000); Kings Close Lot 43 (Tax Map/Parcel Number 048I B 001.00-000); High Street Lot 66 (Tax Map/Parcel Number 048I C 001.00-000);

Northbridge Close Lot 78 (Tax Map/Parcel Number 048P B 002.00-000); Northbridge Close Lot 80 (Tax Map/Parcel Number 048P B 004.00-000); Northbridge Close Lot 83 (Tax Map/Parcel Number 048P A 003.00); Northbridge Close Lot 84 (Tax Map/Parcel Number 048P A 004.00-000); Northbridge Close Lot 89-R (Tax Map/Parcel Number 048P A 009.00-000); Northbridge Close Lot 91 (Tax Map/Parcel Number 048P A 011.00-000); Oak Terrace Cove Lot 106 (Tax Map/Parcel Number 047M D 006.00-000); Oak Terrace Cove Lot 107 (Tax Map/Parcel Number 047M D 005.00-000); Oak Terrace Cove Lot /PT-108 (Tax Map/Parcel Number 047M D 004.00-000); Oak Terrace Cove Lot 109 (Tax Map/Parcel Number 047M D 003.00-000); Oak Terrace Cove Lot 110 (Tax Map/Parcel Number 047M D 002.00-000); Oak Terrace Cove Lot 111 (Tax Map/Parcel Number 047M D 001.00-000); High Street Lot 167 (Tax Map/Parcel Number 048I D 003.00-000); High Street Lot 180 (Tax Map/Parcel Number 048 002.04-000); and High Street Lot 182 (Tax Map/Parcel Number 048P C 002.00-000).

34.     Plaintiff Matt C. Caldwell, Jr. is a resident of Kingston, Tennessee. By profession, he is a land developer and is the Managing Partner of Ladd Landing, LLC. Mr. Caldwell owns property and does business in Kingston, Tennessee. The property Mr. Caldwell owns includes 8.30 acres on Liggett Street, Kingston, Tennessee (Tax Map/Parcel Number 058 115.00-000); and that located at 1022 Northbridge Close, Kingston, Tennessee (Tax Map/Parcel Number 048P-00700-000); Lot 00 Hartford Village Way (Tax Map/Parcel Number 068J-00800-000); 418 Mid Street (Tax Map/Parcel 047O-E-011.00-000); 318.50 acres on Gordon Hollow Road (Stowers Prop Subdivision), Kingston, Tennessee (Tax Map/Parcel Number 104-014.00-000); Highland Reserve Lot 31 (Tax Map/Parcel Number 79-05600-000); Highland Reserve Lot 36 (Tax Map/Parcel Number 79-061.00-000); Highland Reserve Lot 38 (Tax Map/Parcel Number 089-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); Waterford Place-BC-4E (Tax Map/Parcel Number

946848.4

047L-B-001.00-005); Bradford Way Lot 4 – Brentwood Place (Tax Map/Parcel Number 058G-009.11-000). Before the spill, Mr. Caldwell and his partners spent millions of dollars investing in these properties and other properties listed in this Complaint, and improving them. The value of these and other properties and the investments in them has significantly diminished.

35.     Plaintiff Marie Corina Caldwell is a citizen and resident of Kingston, Tennessee. Marie Corina Caldwell owns property in Kingston, Tennessee, including real property located at RR1-152 Claygate (Tax Map/Parcel Number RC1 047-033.11-001).

36.     Plaintiff Brentwood, Ltd. is a Tennessee limited company with its headquarters in Kingston, Tennessee. Brentwood, Ltd. owns property and does business in Kingston, Roane County, Tennessee. Real property owned by Brentwood, Ltd. is located at Brentwood Way, Section B (Tax Map/Parcel 058G-00900-000) and Ridgecrest Drive (Tax Map/Parcel 058J E 03400-000).

37.     Plaintiff Browder Hardware, Inc. is a Tennessee corporation with its headquarters in Kingston, Tennessee. Browder Hardware, Inc. does business as a convenience store in Kingston, Roane County, Tennessee. Plaintiff's business income has been diminished in value due to the catastrophe.

38.     Plaintiff Browder Hardware Old Capitol Town, LLC is a Tennessee limited liability corporation with its headquarters in Kingston, Tennessee. The real property that Browder Hardware Old Capitol Town, LLC owns in Kingston includes 1100 Ladd Landing Boulevard (Tax Map/Parcel Number 047-033.08-000).

39.     Plaintiff Joseph M. Caldwell is a citizen and resident of Kingston, Tennessee. Joseph M. Caldwell does business as a real estate agent and owns real property in Kingston, Roane County, Tennessee, including real property located at RC1-154 Claygate (Tax

Map/Parcel Number 047-033.11-005). Mr. Caldwell's business income and property are diminished in value.

40.    Plaintiffs Michael Caldwell and Merendia Caldwell are citizens and residents of Kingston, Tennessee who own real property in Kingston, Roane County, Tennessee, including real property located at 150 Bradford Village Way (Tax Map/Parcel 068G C 017.00-000) and Harbor View Way, Lot 158 (Tax Map/Parcel 068G A 021.00-000).

41.    Plaintiffs Edward L. Chasteen and Teresa Caldwell Chasteen are citizens and residents of Kingston, Tennessee, who own real property in Kingston, Roane County, Tennessee, including real property located at Villa RC1-161 Claygate (Tax Map/Parcel Number 047-033.11-016).

42.    Plaintiff Teresa Caldwell Chasteen is a citizen and resident of Kingston, Tennessee. Ms. Chasteen owns property located at Northbridge Close Lot 92 (Tax Map/Parcel Number 048P-A-012.00-000); Northbridge Close Lot 93 (Tax Map/Parcel Number 048P-B-005.00-000); and Northbridge Close Lot 95 (Tax Map/Parcel Number 048P-B-007.00-000).

43.    Plaintiff The Citizens National Bank of Athens, Tennessee is a national association with its headquarters in Athens, Tennessee. The Citizens National Bank of Athens, Tennessee owns real property and does business in Kingston, Roane County, Tennessee. The Citizens National Bank of Athens, Tennessee owns real property located at 508 Kings Close, Lot 39 (Tax Map/Parcel 048I-B-005.00-000).

44.    Plaintiff Patrick C. Cooley is a resident of Kingston, Tennessee. Patrick C. Cooley owns real property in Kingston, Roane County, Tennessee, including that located at 1021 Ladd Landing Boulevard – Waterford Place (Tax Map/Parcel Number 047L B 005.00-001); 1025 Ladd Landing Boulevard – Waterford Place (Tax Map/Parcel Number 047L B

005.00-002); and 1027 Ladd Landing Boulevard – Waterford Place (Tax Map/Parcel Number 047L B 005.00-003).

45.     Plaintiff Robert L. Delaney is a resident of Nashville, Tennessee. Robert L. Delaney is a partner in Ladd Landing, LLC and owns real property in Kingston, Roane County, Tennessee, including that located at Kentucky Street, North (Tax Map/Parcel 047K-D-002.00-000); Centers Ferry Road (Tax Map/Parcel 047L-A-001.01-000, 047L-A-001.04-000; 047L-A-001.06-000 and 047L-A-001.07-000) and 149 Kentucky Street (Tax Map/Parcel 058B-A-008.00-000).

46.     Plaintiff Amanda Delaney Miller is a resident of Gatlinburg, Tennessee. Amanda Delaney Miller owns real property in Kingston, Roane County, Tennessee, including that located at Kentucky Street, North (Tax Map/Parcel 047K-D-002.00-000); Centers Ferry Road (Tax Map/Parcel 047L-A-001.01-000, 047L-A-001.04-000; 047L-A-001.06-000 and 047L-A-001.07-000) and 149 Kentucky Street (Tax Map/Parcel 058B-A-008.00-000).

47.     Plaintiffs Richard K. Evans and Celia Simon are residents of Kingston, Tennessee. Richard K. Evans and Celia Simon own real property in Kingston, Roane County, Tennessee, including that located at BC-4B (Tax Map/Parcel Number 047L-B-001.00-002); 158 Claygate Court (Tax Map/Parcel 047-033.11-C-006); 1012 Brentwood Way (Tax Map/Parcel 058J E 003.01-000).

48.     Plaintiff Eye Centers of Tennessee, LLC is a Tennessee limited liability corporation with its headquarters in Kingston, Tennessee. Eye Centers of Tennessee, LLC does business as Surgeons and Doctors of Optometry in Kingston, Tennessee. Eye Centers of Tennessee, LLC's business income has been diminished in value due to the catastrophe.

946848.4

49.     Plaintiff Foil Wyatt Partnership is a Mississippi partnership with its

headquarters in Jackson, Mississippi. Foil Wyatt Partnership owns real property in Kingston,

Roane County, Tennessee, including that located at BC-12 Waterford Place (Tax Map/Parcel

Number 047L-B-007.00-000).

50.     Plaintiff Mike Foil is a citizen and resident of Jackson, Mississippi.

Plaintiff Bowden Wyatt is a citizen and resident of Jackson, Mississippi. Mr. Foil and Mr. Wyatt

hold ownership of 18.3 acres on High Street, Kingston, Roane County, Tennessee (Tax

Map/Parcel Number 048 002.03-000).

51.     Plaintiff J. Baker Hamilton is a citizen and resident of Kingston,

Tennessee. Mr. Hamilton owns real property in Kingston, Roane County, Tennessee, including

105 Oak Terrace Cove (Tax Map/Parcel Number 047M-D-007.00); 104 Oak Terrace Cove (Tax

Map/Parcel Number 047M-D-008.00); 420 High Street (Tax Map/Parcel Number 0481 D

004.00-000); Lot 1, 201 Picket Way (Tax Map/Parcel Number 59B/A/02300); Lot 2, 301

Homestead Court (Tax Map/Parcel Number 59A/A/02200); Lot 3, 303 Homestead Court (Tax

Map/Parcel Number 59A/A/02100); Lot 4, 305 Homestead Court (Tax Map/Parcel Number

59A/A/020000; Lot 5, 307 Homestead Court (Tax Map/Parcel Number 59A/A/01900); Lot 6,

309 Homestead Court (Tax Map/Parcel Number 59A/A/01800); Lot 8, 313 Homestead Court

(Tax Map/Parcel Number 59A/A/01600); Lot 9, 315 Homestead Court (Tax Map/Parcel Number

59A/A/01500); Lot 10, 317 Homestead Court (Tax Map/Parcel Number 59A/A/01400); Lot 11,

316 Homestead Court (Tax Map/Parcel Number 59A/A/01300); Lot 13, 312 Homestead Court

(Tax Map/Parcel Number 59A/A/01100); Lot 14, 308 Homestead Court (Tax Map/Parcel

Number 59A/A/01000); Lot 19, 405 Cottage Place (Tax Map/Parcel Number 59A/A/00500); Lot

20, 407 Cottage Place (Tax Map/Parcel Number 59A/A/00400); Lot 21, 409 Cottage Place (Tax

946848.4

Map/Parcel Number 59A/A/00300); Lot 22, 411 Cottage Place (Tax Map/Parcel Number 59A/A/00200); Lot 24, 410 Cottage Place (Tax Map/Parcel Number 59B/A/01800); Lot 27, 404 Cottage Place (Tax Map/Parcel Number 59B/A/01500); Lot 28, 402 Cottage Place (Tax Map/Parcel Number 59B/A/01400); Lot 29, 400 Cottage Place (Tax Map/Parcel Number 59B/A/01300); Lot 30, 206 Pickett Way (Tax Map/Parcel Number 59B/A/01200); Lot 31, 204 Pickett Way (Tax Map/Parcel Number 59B/A/01100); Lot 32, 200 Pickett Way (Tax Map/Parcel Number 59B/A/01000); Lot 34, 634 High Point Orchard Road (Tax Map/Parcel Number 59B/A/00200); Lot 35, 638 High Point Orchard Road (Tax Map/Parcel Number 59B/A/00300); Lot 36, 642 High Point Orchard Road (Tax Map/Parcel Number 59B/A/00400); Lot 37, 646 High Point Orchard Road (Tax Map/Parcel Number 59B/A/00500); Lot 38, 650 High Point Orchard Road (Tax Map/Parcel Number 59B/A/00600); Lot 39, 654 High Point Orchard Road (Tax Map/Parcel Number 59B/A/00700); Lot 40, 660 High Point Orchard Road (Tax Map/Parcel Number 59B/A/00800); Common area at High Point Orchard Road (Tax Map/Parcel Number 59/no grp/01100); Common area at Ladd Landing Way (Tax Map/Parcel Number 59B/A/00900); Property referred to as "Roane State Highway Farm" (Tax Map/Parcel 056-064.00); and BC-4D Waterford Place (Tax Map/Parcel 047L B 001.00-004).

52. Plaintiff Kari Hamilton is a citizen and resident of Kingston, Tennessee. Mrs. Hamilton owns real property in Kingston, Roane County, Tennessee located at 420 High Street (Tax Map/Parcel Number 0481 D 004.00-000).

53. Plaintiff Highland Reserve, LLC is a Tennessee limited liability corporation with its headquarters in Kingston, Tennessee. Highland Reserve, LLC owns real property and does business in Kingston, Roane County, Tennessee. Real property owned by Highland Reserve, LLC is located at the Highland Reserve subdivision including 64.30 acres

(Tax Map/Parcel 79-01603-000); Smalley Lane (Tax Map/Parcel 79-01600-000); common area 3.75 acres (Tax Map/Parcel 79-10100-000); common area 4.41 acres (Tax Map/Parcel 79-08400-000); common area 1.44 acres (Tax Map/Parcel 79-11100-000); common area .94 acres (Tax Map/Parcel 89-00622-000); Lot 1 (Tax Map/Parcel 89-00611-000); Lot 2 (Tax Map/Parcel 89-00610-000); Lot 3 (Tax Map/Parcel 89-00609-000); Lot 4 (Tax Map/Parcel 89-00603-000); Lot 5 (Tax Map/Parcel 89-00604-000 ); Lot 6 (Tax Map/Parcel 79-03100-000); Lot 8 (Tax Map/Parcel 79-03300-000); Lot 9 (Tax Map/Parcel 79-03400-000); Lot 10 (Tax Map/Parcel 79-03500-000); Lot 11 (Tax Map/Parcel 79-03600-000); Lot 12 (Tax Map/Parcel 79-03700-000); Lot 14 (Tax Map/Parcel 79-03900-000); Lot 20 (Tax Map/Parcel 79-04500-000); Lot 22 (Tax Map/Parcel 79-04700-000); Lot 30 (Tax Map/Parcel 79-05500-000); Lot 31 (Tax Map/Parcel 79-05600-000); Lot 36 (Tax Map/Parcel 79-06100-000); Lot 38 (Tax Map/Parcel 89-00606-000); Lot 39 (Tax Map/Parcel 89-00607-000); Lot 40 (Tax Map/Parcel 89-00608-000); Lot 42 (Tax Map/Parcel 079-06301-000); Lot 43 (Tax Map/Parcel 89-00617-000); Lot 44 (Tax Map/Parcel 89-00618-000); Lot 45 (Tax Map/Parcel 89-00619-000); Lot 46 (Tax Map/Parcel 89-00620-000); Lot 47 (Tax Map/Parcel 89-00621-000); Lot 48R (Tax Map/Parcel 79-07400-000); Lot 49 (Tax Map/Parcel 89-00616-000); Lot 52R (Tax Map/Parcel 79-07300-000); Lot 53R (Tax Map/Parcel 79-07500-000); Lot 54R (Tax Map/Parcel 79-07600-000); Lot 55 (Tax Map/Parcel 79-07700-000); Lot 56 (Tax Map/Parcel 79-07800-000); Lot 58 (Tax Map/Parcel 79-08000-000); Lot 59 (Tax Map/Parcel 79-08100-000); Lot 60 (Tax Map/Parcel 79-08300-000); Lot 62 (Tax Map/Parcel 79-09400-000); Lot 63 (Tax Map/Parcel 79-09500-000); Lot 64 (Tax Map/Parcel 79-09300-000); Lot 65 (Tax Map/Parcel 79-09600-000); Lot 66 (Tax Map/Parcel 79-09700-000); Lot 67 (Tax Map/Parcel 79-12000-000); Lot 68 (Tax Map/Parcel 79-11900-000); Lot 69 (Tax Map/Parcel 079-11800-000); Lot 70 (Tax Map/Parcel 079-11700-

000); Lot 71 (Tax Map/Parcel 079-11600-000); Lot 75 (Tax Map/Parcel 079-11200-000); Lot 76 (Tax Map/Parcel 079-11000-000); Lot 77 (Tax Map/Parcel 079-10900-000); Lot 80 (Tax Map/Parcel 079-10600-000); Lot 81 (Tax Map/Parcel 79-10500-000); Lot 82 (Tax Map/Parcel 79-10400-000); Lot 83 (Tax Map/Parcel 79-10300-000); Lot 84 (Tax Map/Parcel 79-10200-000); Lot 85 (Tax Map/Parcel 79-10000-000); Lot 86 (Tax Map/Parcel 79-09900-000); Lot 87 (Tax Map/Parcel 79-09800-000); Lot 88 (Tax Map/Parcel 89-00628-000); Lot 89 (Tax Map/Parcel 89-00627-000); Lot 90 (Tax Map/Parcel 089-006.26-000); Lot 91 (Tax Map/Parcel 89-00625-000); Lot 92 (Tax Map/Parcel 89-00624-000); Lot 93 (Tax Map/Parcel 89-00623-000); Lot 94 (Tax Map/Parcel 79-09200-000); Lot 95 (Tax Map/Parcel 79-09100-000); Lot 96 (Tax Map/Parcel 79-0900-000); Lot 97 (Tax Map/Parcel 79-08900-000); Lot 98 (Tax Map/Parcel 79-08800-000); Lot 100 (Tax Map/Parcel 79-08600-000); Lot 102 (Tax Map/Parcel 79-0700-000); Lot 103 (Tax Map/Parcel 79-06900-000); Lot 104 (Tax Map/Parcel 79-06800-000); Lot 105 (Tax Map/Parcel 79-06700-000); Lot 106 (Tax Map/Parcel 79-06600-000); Lot 107 (Tax Map/Parcel 79-06500-000); Lot 108 (Tax Map/Parcel 79-06400-000); Lot 118 (Tax Map/Parcel 079-07100-000); Chamberlain Cove Road, Ph V 5.3 acres (Tax Map/Parcel 79-01800-000); Enclave Pointe, Lot 610 (Tax Map/Parcel 79-01808-000); Enclave Pointe, Lot 620 (Tax Map/Parcel 79-01809-000); Enclave Pointe, Lot 630 (Tax Map/Parcel 79-01810-000); Enclave Pointe, Lot 640 (Tax Map/Parcel 79-01800-000); and Enclave Pointe, Lot 650 (Tax Map/Parcel 79-01812-000).

54.     Plaintiff KRA, LLC is a Tennessee limited liability corporation with its headquarters in Kingston, Tennessee.  KRA, LLC owns property and does business as a landlord in Kingston, Roane County, Tennessee.  The property KRA, LLC owns is located at corner of Race Street and Kentucky Street (Tax Map/Parcel 058B A 010.00-000).

55.     Plaintiff Larry E. Patterson Properties, LLC is a Tennessee limited liability corporation with its headquarters in Kingston, Tennessee. Larry E. Patterson Properties, LLC owns real property in Kingston, Roane County, Tennessee, including that located at 1029 Ladd Landing Boulevard (Tax Map/Parcel 047L B 005.00-004); 1031 Ladd Landing Boulevard (Tax Map/Parcel 047L B 005.00-006); and 1035 Ladd Landing Boulevard (Tax Map/Parcel 047L B 005.00-005).

56.     Plaintiff LEC Properties is a partnership with its headquarters in Kingston, Tennessee. LEC Properties owns property and does business in Kingston, Roane County, Tennessee. The property LEC Properties owns is at 218 North Third Street (Tax Map/Parcel 058B E 012.00-000).

57.     Plaintiff William E. Lindsey is a resident of Knoxville, Tennessee. Mr. Lindsey owns property and does business in Kingston, Roane County, Tennessee. The property Mr. Lindsey owns is located at Northbridge Close, Lot 88 (Tax Map/Parcel 058P A 008.00-000).

58.     Plaintiff Ninth JDA, LLC is a Tennessee limited liability corporation with its headquarters in Kingston, Tennessee. Ninth JDA, LLC owns property and does business in Kingston, Roane County, Tennessee. Real property owned by Ninth JDA, LLC is located at Bowater Office (Tax Map/Parcel 058G-C-00920-000); Brentwood Way, Section B REV (Tax Map/Parcel 058G-C-00921-000); and District Attorney's Office (Tax Map/Parcel 058G-C-00918-000).

59.     Plaintiff Old Capitol Town, LLC is a Tennessee limited liability corporation with its headquarters in Kingston, Tennessee. Old Capitol Town, LLC owns property and does business in Kingston, Roane County, Tennessee. Real property owned by Old

946848.4

Capitol Town, LLC is located at Kentucky Street, North, Building A (Tax Map/Parcel 47-03306-001); Kentucky Street, North, Building B (Tax Map/Parcel 47-03306-002); 130 Market Street (Tax Map/Parcel 47-03306-003); 140 Market Street (Tax Map/Parcel 47-03306-004); 120 Market Street (Tax Map/Parcel 47-03306-005); 110 Market Street (Tax Map/Parcel 47-03306-006); 210 Market Street (Tax Map/Parcel 47-03306-007); 220 Market Street (Tax Map/Parcel 47-03306-008); 230 Market Street (Tax Map/Parcel 47-03306-009); 410 Market Street (Tax Map/Parcel 47-03306-010); 420 Market Street (Tax Map/Parcel 47-03306-011); 430 Market Street (Tax Map/Parcel 47-03306-012); 440 Market Street (Tax Map/Parcel 47-03306-013); 450 Market Street (Tax Map/Parcel 47-03306-014); and Lot BC6 North Kentucky Street (Tax Map/Parcel 47-033-06-000).

60.     Plaintiff P.C.G., Inc., d/b/a Pioneer Construction Group is a Tennessee corporation with its headquarters in Kingston, Tennessee. P.C.G., Inc., d/b/a Pioneer Construction Group owns property and does business as building contractor in Kingston, Roane County, Tennessee. Pioneer Construction Group's business income has been damaged due to the catastrophe.

61.     Plaintiff Pioneer Realty and Associates is a sole proprietorship with its headquarters in Kingston, Tennessee. Pioneer Realty and Associates owns property and does business as a real estate brokerage, property development and property management firm in Kingston, Roane County, Tennessee. Pioneer Realty and Associates' business income has been damaged due to the catastrophe.

62.     Plaintiff R.P. Beard & Son, Inc. is a Tennessee corporation with its headquarters in Kingston, Tennessee. R.P. Beard & Son, Inc. owns property and does business

as an excavating contractor in Kingston, Roane County, Tennessee. R.P. Beard & Son, Inc.'s business income has been damaged due to the catastrophe.

63.     Plaintiff Robert Neil Scalf is a resident of Kingston, Tennessee. Mr. Scalf owns property and does business as a real estate investor and property manager in Kingston, Roane County, Tennessee. The property Mr. Scalf owns is located at 159 Hartford Village Way (Tax Map/Parcel Number 068J B 017.00-000). Mr. Scalf's business income has been damaged due to the catastrophe.

64.     Plaintiff Sean D. Stephens is a citizen and resident of Kingston, Tennessee. Sean D. Stephens does business as a real estate agent in Kingston, Roane County, Tennessee. Mr. Stephens's business income has diminished in value.

65.     Plaintiff Sean D. Stephens & Associates, LLC is a Tennessee limited liability corporation with its headquarters in Crossville, Tennessee. Sean D. Stephens & Associates, LLC owns property and does business as a marketing and public relations firm in Kingston, Roane County, Tennessee. Sean D. Stephens & Associates, LLC's property and business income have been damaged as a result of the catastrophe.

66.     Plaintiff Matt C. Caldwell, Jr. d/b/a Stowers Forest is a sole proprietorship with its headquarters in Kingston, Tennessee. Matt C. Caldwell, Jr. d/b/a Stowers Forest owns property and does business as a land developer in Kingston, Roane County, Tennessee. Stowers Forest's business income has been damaged as a result of the catastrophe.

67.     Plaintiff Villages of Center Farm, LP a/k/a Centerbury, LP is a Tennessee limited partnership with its headquarters in Kingston, Tennessee. Villages of Center Farm, LP a/k/a Centerbury, LP owns property and does business in Kingston, Roane County, Tennessee. Villages of Center Farm, LP a/k/a Centerbury, LP owns real property located at Hartford Village

Way (Tax Map/Parcel 068J-B-010.01-000); Ed Hart Prop TR2 (Tax Map/Parcel 80-01405-000);

James Ferry Road (Tax Map/Parcel 68-03400-000); Lawson Center Road (Tax Map/Parcel 068J-

B-01501-000); Tracts BB, DD, PT, FF (Tax Map/Parcel 068G-F-00300-000); Lot PT (Tax

Map/Parcel 068G-F-00108-000 and 068G-E-04001-000); 2022 Franklin Village Trace (Tax

Map/Parcel 068G-F-00100-000); three 5' buffer strips (Tax Map/Parcel 68G-E-01400-000, 68G-

D-02801-001 and 068G-A-00100-000); James Ferry Road, Lot 2 (Tax Map/Parcel 68-03404-

000); Greystone Way, Lot 179 (Tax Map/Parcel 068G-B-02000-000); Greystone Way, Lot 180

(Tax Map/Parcel 068G-B-01900-000); Greystone Way, Lot 181 (Tax Map/Parcel 068G-B-

01800-000); Greystone Way, Lot 182 (Tax Map/Parcel 068G-B-01700-000); Greystone Way,

Lot 190 (Tax Map/Parcel 068G-B-00800-000); Greystone Way, Lot 191 (Tax Map/Parcel 068G-

B-00700-000); Greystone Way, Lot 192 (Tax Map/Parcel 068G-B-00500-000); Greystone Way,

Lot 193 (Tax Map/Parcel 068G-A-02400-000); Greystone Way, Lot 194 (Tax Map/Parcel 068G-

A-02300-000); Franklin Village Trace Lot 1ABC (Tax/Map Parcel 068G-F-00301-000);

Franklin Village Trace Lot 1 (Tax/Map Parcel 068G-F-00600-000); Franklin Village Trace Lot 2

(Tax Map/Parcel 068G-F-00700-000); Franklin Village Trace Lot 3 (Tax Map/Parcel 068G-F-

00800-000); Franklin Village Trace Lot 4 (Tax Map/Parcel 068G-F-00900-000); Franklin

Village Trace Lot 6 (Tax Map/Parcel 068G-F-01100-000).

      68.    Plaintiff The Villas Condominium Association on Parcel BC-9 is a

Tennessee corporation and Plaintiff BC-4 Properties Condominium Association, Inc. is a

Tennessee corporation with its headquarters in Kingston, Tennessee. The Villas Condominium

Association on Parcel BC-9 and BC-4 Properties Condominium Association, Inc. each owns

property and does business as real estate investment and management entities in Kingston, Roane

County, Tennessee. Plaintiff BC-4 Properties and Condominium Association, Inc. owns the

common area known as Tax Map/Parcel 047L B 001.00-000; and Plaintiff The Villas Condominium Association on Parcel BC-9 owns the common area known as Tax Map/Parcel 047L B 005.00-000. The entities' property interests and business income have been damaged as a result of the catastrophe.

69.     Plaintiff Waterfront Plantation, LLC is a Tennessee limited liability corporation with its headquarters in Kingston, Tennessee. Waterfront Plantation, LLC owns property and does business in Kingston, Roane County, Tennessee. Waterfront Plantation, LLC owns property located at Rockwood Ferry Road (Tax Map/Parcel 095-010.01-000) and Irwinton Drive (Tax Map/Parcel 104-00100-000).

70.     Plaintiff WL&MC Development, LLC is a Tennessee limited liability corporation with its headquarters in Kingston, Tennessee. WL&MC Development, LLC owns property and does business in Kingston, Roane County, Tennessee. Real property owned by WL&MC Development, LLC is located at 134 Claygate Court (Tax Map/Parcel 047-03311-C-011); 136 Claygate Court (Tax Map/Parcel 047-03311-C-007); 138 Claygate Court (Tax Map/Parcel 047-03311-C-012); 140 Claygate Court (Tax Map/Parcel 047-03311-C-008); 142 Claygate Court (Tax Map/Parcel 047-03311-C-013); 144 Claygate Court (Tax Map/Parcel 047-03311-C-009); 146 Claygate Court (Tax Map/Parcel 047-03311-C-014); 148 Claygate Court (Tax Map/Parcel 047-03311-C-010); 156 Claygate Court (Tax Map/Parcel 047-03311-C-002); 160 Claygate Court (Tax Map/Parcel 047-03311-C-003); Claygate Villa 161 (Tax Map/Parcel 047-03311-016); Claygate Villa 163 (Tax Map/Parcel 047-03311-C-015); 16.09 acres (Tax Map/Parcel 047-033-11-000); 1037 Waterford Place (Tax Map/Parcel 047L-C-005-00-008); 1043 Waterford Place (Tax Map/Parcel 047L-00500-C-009); 1041 Waterford Place (Tax

Map/Parcel 047L-B-005-00-007); and 1039 Waterford Place (Tax Map/Parcel 047L-C-005-00-010).

71.     Plaintiff Gary M. Wolfe is a resident of Kingston, Tennessee. Mr. Wolfe owns property and does business in Kingston, Roane County, Tennessee. Mr. Wolfe owns property located at BC-4C Waterford Place (Tax Map/Parcel 047L-B-001.00-003).

72.     Worldwide Interactive Network, Inc. is a corporation incorporated in the State of Tennessee with its principal place of business in Kingston, Tennessee. Worldwide Interactive Network, Inc. owns property and does business in Kingston, Roane County, Tennessee. The property Worldwide Interactive Network, Inc. owns includes that located at Northbridge Close, Lot 85 (Tax Map/Parcel 048P-A-005.00-000); BC-4 A (Tax Map/Parcel 047L B 001.00-001); and BC-4 F (Tax Map/Parcel 047L-B-001.00-006).

73.     Plaintiffs have been harmed by diminution in their property value, damage to their businesses and lost profits, and/or by loss of the enjoyment and use of their property and surroundings, a result of TVA's negligent, reckless, willful and wanton non-discretionary conduct.

74.     TVA is a wholly owned federal corporation created under an Act of Congress. Its headquarters is in Knoxville, Tennessee.

75.     TVA is the largest power producer in the United States, generating electricity by burning coal in 11 fossil-powered plants.

76.     TVA owns and operates the Kingston Fossil Plant in Kingston, Tennessee.

77.     At all times material hereto, TVA's operation of its coal-fired power plants and associated facilities, including the Kingston Fossil Plant, was and is a commercial function and not a governmental operation.

## IV.  FACTS

### A.  TVA and the History of the Failed Impoundment.

78.   The TVA Kingston Fossil Plant is a 1,600 megawatt, coal-fired power plant, with a business address at or near 714 Swan Pond Road in Harriman, Tennessee.

79.   TVA is in the business of generating electricity for sale by burning coal.

80.   TVA's KIF facility burns approximately 14,000 tons of coal per day in the course of its business.

81.   The KIF plant has nine coal fired units with a maximum generating capacity of approximately 1,600 Megawatts, making it one of TVA's largest coal burning facilities.

82.   The KIF facility is located near the confluence of the Clinch and Emory Rivers on the Watts Bar Reservoir, approximately one mile northwest of Kingston, Tennessee.

83.   The KIF facility was constructed and went into operation in the early 1950s.

84.   TVA creates coal ash from burning coal.

85.   Coal ash from the plant is mixed with water and sluiced from the plant to the main ash pond where it settles to the bottom and water from the top is pumped into the stilling pond where more solids settle out.  The settled solids are then dredged from the bottom of the stilling and ash ponds and placed into a dredge cell to further solidify.  A dredge cell is the ash disposal area that contains settled ash from the main ash stilling ponds.

86.   Before December 22, 2008, the TVA impoundment contained approximately 9.4 million cubic yards of coal ash sludge.  The coal ash sludge occupied approximately 98 acres, and rose 60-65 feet above the Emory River, which flows into the Clinch River and then into the Tennessee River.

87.     The cause of the exterior dike failure at KIF was buildup of water within the dredge cell. Water built up within the dredge cell because of, among other failures by TVA, its negligence and willful, wanton and reckless conduct, including the construction, inspection, and maintenance of the dredge cell, and the failure to train its personnel in applicable policies and procedures.

88.     TVA knew or should have known that pressure from the buildup of water and other factors would cause the dike to fail and the massive release of coal ash, and willfully, wantonly, recklessly disregarded the clear warning signs of the coming failure.

**B.      TVA Negligently Inspected the Sludge Impoundment.**

89.     An internal 1985 engineering memo noted that Dike C of the impoundment that failed was not built according to design and had a lower than desirable factor of safety. The memo recommended that the dike be inspected daily. TVA did not inspect the dike daily.

90.     The person who conducted inspections only did so four days a week at best and was only looking for routine maintenance issues. He did a drive around look at the dike. He had no training to conduct a substantive inspection or determine the stability of the impoundment.

91.     Most years, TVA's engineers conducted an annual "stability" inspection of the impoundment. The last one was conducted on October 20, 2008.

92.     According to Dr. Bruce Tschantz, a well-regarded and highly qualified expert in the field of engineering and dam safety, and a member of the Tennessee Department of Environment and Conservation's Advisory Board relating to the coal sludge disaster, the October 20, 2008 stability inspection was "a sham" that "did not meet up to the standard of

practice that we all recognized in maintaining and operating this type of structure." Transcript 9/21/11 at 176:10-23; 175:21-23.

93. Dr. Tschantz testified that he based his conclusion on the facts that TVA's inspector had "no experience or background or training at all in inspection or dam safety or any kind of structure of this type at all. He was not apprised of what the purpose of the inspection was....He was not prepared or prepped for the inspection. The report was late... and I think most of all, from what we learned later, is that the report was cleaned, it was cleaned by TVA P.R. people." *Id*. at 176:13-177:3.

94. According to Dr. Tschantz, the inspectors failed to identify or note areas of internal erosion that were photographed during the course of the inspection. *Id*. at 177:24-181:11. Such areas of internal erosion would have required immediate attention and further investigation, including core drilling and sampling. In fact, Dr. Tschantz said that, if he had seen the same thing, he would have immediately contacted the owner of the impoundment rather than waiting to identify the problems in an inspection report. *Id*. at 180:12-181:6.

95. Although Dr. Tschantz testified that the photographs of the erosion and sloughs were the "poster child of examples of the kind of things that inspectors should be aware of," TVA's inspectors did not raise any alarms as a result of these problems. Dr. Tschantz said that the condition clearly indicated that "immediate steps needed to be taken." *Id*. at 182:18-24.

96. The inspectors, however, did not have any training in inspection, and they thought that the inspections they were conducting were maintenance inspections, not stability inspections.

97. John Albright, one of the inspectors of the impoundment on October 20, 2008, is not a professional engineer.

946848.4

98. Mr. Albright never saw any guidelines for inspections before the failure of the impoundment. Transcript at 206.

99. Mr. Albright had no training on how to take piezometer or wellpoint readings of the groundwater monitoring instruments which TVA had installed on the dike to measure water pressure. Transcript at 235.

100. Mr. Albright testified that he did not know why he would look for seeps in the impoundment during an inspection, even though seeps would indicate a potential stability problem.

101. Mr. Albright agreed with another of the inspectors, Chris Buttram, that there were repairs on the dike that needed to be addressed immediately, but neither Mr. Buttram nor Mr. Albright told anyone to make immediate repairs.

102. Chris Buttram, who the Office of Inspector General noted was the "lead" on the October 20, 2008 inspection, had never been given any training prior to October 20, 2008 in the examination of embankment dams. Transcript at 137.

103. Mr. Buttram stated that he did not write the report of the October 20, 2008 inspection until after the disaster. Transcript at 120. He initially drafted the report of the October 20, 2008 inspection to state that repairs to Dike C at the point of failure needed to be made "immediately," but that after TVA media relations suggested that he remove the word "immediately" from the final report, he removed it. Transcript at 124.

C. **TVA Negligently Constructed the Sludge Impoundment.**

104. An 1985 internal memo written by a TVA engineer that raised serious concerns about the stability of Dike C noted that it had not been constructed according to the design drawings. It also noted that the "as built" factor of safety was less than desirable.

105. The dikes were designed to be constructed with consolidated bottom ash, which is more stable than fly ash, but they were not.

106. TVA did not have any as-built drawings that reflected the true construction of the impoundment.

107. TVA did not have an engineer on-site to perform Construction Quality Assurance/Construction Quality Control while modifications or construction of ash storage facilities occurred to ensure construction with good engineering practice and in accordance with design drawings.

108. Dr. Tschantz testified that in constructing the dike, it would have been a requirement of the standard of care for TVA to check the foundation before it built the dike up in order to make sure that the foundation was solid and not weak. Transcript 9.21.11, p. 199:4-13.

109. TVA did not attempt to discover whether the foundation of the dike was weak before it built it up vertically.

110. TVA ignored its own 2004 *Operations Manual Dredge Cell Lateral Expansion*, which indicated that ash "has remained apparently loose despite years of being under the existing ash overburden" and "liquefies under even slight vibration."

111. The geotechnical parameters of the ash material (*i.e.,* coal ash sludge waste) and construction materials used in the exterior dredge cell dikes at KIF over time were in fact highly variable. TVA ignored this fact despite having actual or constructive knowledge of it.

112. From an engineering standpoint, the highly variable parameters of the KIF coal ash sludge waste and dike material constituted a significant construction concern and hazard

946848.4

that made it easily foreseeable to TVA well before December 22, 2008, that failures of the impoundment could and would occur.

113.    Nevertheless, TVA ignored this easily foreseeable reality and failed to take remedial measures to ensure the safety of the impoundment, contrary to applicable engineering or other duties or standards of care.

**D.    TVA Negligently Maintained the Sludge Impoundment.**

114.    TVA failed to address maintenance issues noted in annual inspection reports year after year. These "legacy" issues included erosion, seepage, overgrown vegetation, sparse vegetation, trees growing on dikes, standing water, and piping issues. OIG Report at 33.

115.    TVA was aware that, in order to prevent a failure of the dikes, water should not pond on them. Despite this fact, ponding water was noted repeatedly on the dike benches, including the 2008 Inspection Report.

116.    There were early warning signs that the water in the impoundment was causing instability, including two "blow outs" that occurred in 2003 and 2006. Adequate corrective measures were not taken in response to these in order to address the overall stability of the impoundment.

117.    Marshall Miller, who conducted an audit of TVA's maintenance of the impoundment, determined that the spill could have been prevented if recommended safety modifications had been made prior to the catastrophe. OIG Report at 18-19.

118.    According to the fiscal year 2008 Annual Ash Pond Dike Stability Inspection Report, the cause of the 2003 and 2006 blowouts were a result of "inadequate internal drainage…and infiltration of surface water on the existing dike benches." These problems were never adequately addressed.

119.    TVA installed a drainage system in an attempt to address this problem. TVA applied for a permit modification which stated that it would install piezometers on the north, south and western faces of the dredge cells, and would measure and monitor the water pressures to monitor the performance of the drainage system it installed. The phreatic surface measured in those monitoring devices was, according to the permit, to be compared with that predicted in models created by its engineering consultants, Geosyntec. Transcript at 23. The phreatic surface is the point where groundwater is equilibrated at zero pressure.

120.    Monitoring wells 13, 14, and 15, which were part of the system, were located on the North Dike of the dredge cell 2, near the ultimate location of the failure.

121.    According to Matt Williams, a geotechnical engineer with TVA, TVA typically saw higher water levels in the winter months. Transcript at 25.

122.    In the winter of 2007, TVA took preventative measures to reduce water levels in the dredge cells "in an attempt to avoid another blow out [of the exterior dike]." TVA did not take such preventative measures in the winter of 2008. Instead, TVA continued to pump additional ash wastes and water into the KIF impoundment during the late fall and winter of 2007 and 2008, including pressure on the weak dike.

123.    The water pressure recorded in the monitoring systems was supposed to be taken monthly by a field engineer and reported to a member of the Fossil Engineering Department within TVA. Transcript at 35. For no apparent reason, TVA skipped some months of monitoring.

124.    Within TVA's Fossil Engineering group, the responsibility of receiving the groundwater monitoring data first went to Lynn Petty, then to Christopher Hensley, then to

Jamie Dotson, and finally in the months before the catastrophe, the groundwater pressure reports were sent to Chris Buttram. Transcript at 98-99.

125.    Mr. Hensley testified that no one at TVA ever told him the significance of the groundwater monitoring, and he did not know whether it had anything to do with the stability of the dikes. Transcript at 166. He was only told to take the numbers and put them into a spreadsheet. Transcript at 165.

126.    No one ever told Mr. Hensley how to interpret the data or how to determine if there were levels in the data that were too high or of concern or should be considered a red flag. Transcript at 169. He did not know how to interpret the data. Transcript at 171. He did no analysis of the data. Transcript at 173.

127.    There was no place for the data from the monitoring wells, 13, 14, and 15 to be recorded. Transcript at 177. Therefore, Mr. Hensley did not keep the data, but threw it out and did not report it to anyone. *Id.*

128.    Mr. Hensley was not aware of what a piezometer did, and did not know the significance of the monitoring wells at Kingston, or what role they played with respect to the assessment of the stability of the dikes at Kingston.

129.    The last measurement of water pressure levels was taken on November 19, 2008. The data was sent from Matt Williams to Chris Buttram on December 18, 2008. Transcript at 111.

130.    As of November 18, 2008, roughly half of the monitoring wells and/or piezometers were not functioning, but were destroyed or covered with ash. Transcript at 111.

946848.4

131.	There was a steep increase in the water levels shown in the November 18, 2008 data, similar to a steep increase that preceded the November 2006 blowout.  Transcript at 116.

132.	Mr. Williams never received any confirmation from Mr. Buttram that Mr. Buttram received the data.  Transcript at 122-23.

133.	Mr. Buttram did not consider it part of his job to know whether there was any data from monitoring wells on the north side of the dike, where the failure occurred. Transcript at 154.

134.	In January, 2009, after the catastrophe, Mr. Buttram obtained the password to the groundwater monitoring data so that he could remove the elevated well point data he had quoted.  Those readings were "in the red" on the north side of the dike where the failure occurred.  Transcript at 164-166.

135.	TVA was on notice of a potential catastrophic failure based on the presence of a number of sloughs on the dikes, indicative of the existence of internal failure and collapse that can cause immediate, total failure, as well as other areas of erosion that were observed by TVA engineers on the exterior dikes near the point of ultimate failure in October 2008, two months before the 12/22 disaster.  One inspector, Jamie Dotson, noted multiple sloughs in the same location as the failure in his October 20, 2008 inspection notes. TVA engineers failed to recognize the importance of these areas during their inspection due to their lack of training and experience and, thus, failed to take any maintenance steps to correct them before the 12/22 disaster.

136.	Notably, there is no evidence that TVA took any steps to address or fix the sloughs that were identified in the October 20, 2008 annual inspection.

137.     The October 20, 2008 inspectors also noted a 20 feet long by 2 feet deep eroded area in an "interim" dredge cell slope, indicative of TVA's failure to maintain the impoundment in a way that would have prevented the failure and assured the integrity of the impoundment. A "wet spot" was also noted by TVA at the toe of the KIF Cell 2 dike. This wet spot was estimated to be 4 feet by 4 feet, and located in the area of an old under-drain.

138.     An eroded and washed out area was noted by TVA at the "north end of the dredge cells" in the 2008 inspection, two months before the 12/22 disaster. This eroded and washed out area was recommended by TVA to be repaired "immediately" in the report. There is no evidence that any repairs were made as a result of the October 20, 2008 inspection. Indeed, Mr. Settles testified that he did not take any actions as a result of the inspection and there is no record that he did so.

139.     Despite all of the problems, hazards, and dangers that were known or should have been known to TVA, it continued to pump ash wastes and water into the KIF impoundment.

140.     This resulted in the continued piling of the unstable, wet coal ash sludge waste to a point where there was a water column of over seventy (70) feet in height.

141.     Even though TVA knew or should have known that the impoundment presented a grave danger of immediate failure and the potential for a catastrophic release of the coal ash sludge, TVA failed to adequately maintain or operate its coal sludge impoundment.

**E.     TVA Failed to Train Its Employees In Applicable Policies and Procedures.**

142.     During its investigation of the catastrophe, TVA's OIG was unable to obtain any "policies and procedures dealing with the storing, handling, and maintaining of ash and ash facilities" and were told that none existed. OIG Report at 32. The OIG concluded that

"Without policies and procedures, it is unclear who is responsible for specific tasks, how to address certain problems when they arise, and how to ensure proper communication occurs." *Id.*

143.    TVA did have a few policies and procedures for inspections of ash ponds. TVA employees tasked with inspecting the impoundment testified at the trial that they were not told of the policies and procedures and did not follow them.

144.    Testimony of TVA employees during the trial established that there was no formalized training for dike inspectors, whether for annual or daily inspections. Such training would have allowed the inspectors to recognize maintenance issues early, properly asses the significance of issues identified, identify changing conditions, and properly communicate issues identified. OIG Report at 34.

145.    Matt Williams testified during the trial that TVA was required to monitor the water pressure wellpoints 13, 14 and 15, at the point of failure, because it was a requirement under the landfill permit.

146.    Mr. Williams collected the information and sent it to engineering. He testified that he would be surprised if the information his team collected was not considered or monitored or reviewed by engineering as required by the permit.

147.    As set forth above, Chris Buttram, who received the data before the failure, was not aware of the permit requirements, and was not trained by TVA to know what to do with the data. He testified that he did not even know that there was any monitoring on the north dike or that high water levels could lead to a dangerous situation.

148.    TVA's failure to train Mr. Buttram and other engineers to read and interpret the water pressure data was a substantial cause of the failure.

946848.4

149.    TVA had a policy of no standing water on the dredge cells, and that the water level on the dikes had to be at an absolute minimum.

150.    Despite this policy, Mr. Settles testified that he was "rim ditching" when he constructed the dikes, which made a stream of standing water on the dikes. Mr. Settles and his crew were not trained that this was in direct violation of TVA's policies and procedures.

151.    During the October 20, 2008 inspection, photographs were taken of the ponding, but nothing was done about it because TVA had not trained its inspectors in TVA's policy that required it to maintain minimum water on the dike. They were unaware of the danger standing water posed because they lacked any training.

F.    **The 12/22 Disaster and Resulting Contamination.**

152.    In the early morning hours of December 22, 2008, the impoundment ruptured. Of the 9.4 million cubic yards of coal ash sludge in the impoundment, 57% of it, or 5.4 billion cubic yards (equivalent to 1 billion gallons), spilled out.

153.    Following the rupture of the impoundment, black sludge spread and contaminated the Emory, Clinch and Tennessee Rivers, and Watts Bar Lake.

154.    Each of those bodies of water has been contaminated with toxic chemicals, making large parts of them unfit and undesirable for swimming and other recreational activities.

155.    Many waterfront properties along the Emory River, the Clinch River, the Tennessee River, and in Watts Bar Lake have coal ash sludge residue on their shores.

156.    The disaster suffocated significant aquatic life in rivers, exterminating fish, frogs, and snapping turtles as it moved downstream toward the Tennessee River. Pets and livestock belonging to the residents exposed to the sludge have also died as a result.

157.     Tests on the sludge itself showed unsafe levels of arsenic and vanadium, and elevated levels of other metals found in coal, including mercury, magnesium, selenium, sodium, cobalt and manganese.

158.     Within a week of the disaster, on December 28, 2008, the United States Environmental Protection Agency reported that several heavy metals were present in concentrations above drinking water standards in water near the disaster. Arsenic was found in "very high" concentrations.

159.     On January 2, 2009, testing of river water and ash showed concentrations of eight metals exceeding safe drinking water levels at sites near the disaster, one half-mile from the KIF and two miles from the KIF. Levels of arsenic, lead, chromium and other metals were found at 2 to 300 times higher than drinking water standards. At the site two miles from the disaster, arsenic was at 35 times the drinking water limit.

160.     News reports the following day, on January 3, 2009, reported arsenic levels at 149 times the federal safe drinking water limit in the Emory River just downstream from the KIF.

161.     On January 12, 2009, TDEC issued an order finding that TVA had violated the Tennessee Water Quality Control Act and was liable for the releases of the coal ash sludge.

162.     On February 4, 2009, EPA notified TVA that the release was an unpermitted discharge of a pollutant in contravention of the Clean Water Act.

163.     Independent testing by an associate professor of biology at Appalachian State University found arsenic levels thirty times or higher than the safety standard.

164.    EPA, TVA and the State of Tennessee warned users of Watts Bar Lake to avoid areas where floating ash is observed and to avoid contact with floating ash.

165.    Ash has been found in the water and on the shore as far south as Watts Bar Dam.

166.    Plaintiffs' expert has found numerous violations of the state's numeric chemical water quality criteria for toxic substances for safe recreational use.

167.    The 12/22 disaster and associated release of the coal ash sludge waste onto Plaintiffs' property and into the environment, including nearby waterways, has placed an indelible, undesirable stigma upon their property, resulted in diminished, if not destroyed, property value and their property-related businesses. As a result of the catastrophe, Plaintiffs have lost the use and enjoyment of their property. In a desire to avoid exposure to the toxic waste, they no longer fully utilize their homes, yards, property, and surrounding public access areas.

## G.    **Remediation.**

168.    TVA was and is under a legal duty to immediately remediate and/or abate and/or clean up releases of the coal ash sludge that remains in, on or around or migrating to the residential and recreation areas, navigable waterways and/or other waterways impacted by the disaster and to prevent further illegal releases or discharges of toxic and/or hazardous sludge and solid waste.

169.    The January 12, 2009 order from TDEC required TVA to submit a Corrective Action Plan.

170.    The Corrective Action Plan and clean-up activities included closure areas and recreational advisory areas on the Emory River, which further disrupted Plaintiffs' ability to use and enjoy their property and surroundings.

171.    The clean-up activities include trucking materials to and from the disaster area in an attempt to stabilize the ash and move it for disposal. This increased truck traffic contributes to noise and further inconvenience to Plaintiffs and interferes with their use and enjoyment of property and surroundings and increases the stigma of the area.

172.    The clean-up activities include rail car shipments of the ash from the spill area to a landfill in Perry County, Alabama. The increased rail traffic contributes to noise and further inconvenience to Plaintiffs, interferes with their use and enjoyment of property and surroundings, and increases the stigma of the area.

173.    The clean-up activities are ongoing and will continue for the foreseeable future, causing further continued disruption to Plaintiffs' use and enjoyment of property and surroundings and increasing the stigma of the area and devaluation of property.

174.    TVA has admitted that a complete clean-up of the disaster is impossible, and some ash will always remain on the bottom of the downstream rivers.

175.    Even after five years of clean-up activities, the 12/22 disaster and clean-up will leave an indelible, undesirable stigma upon Plaintiffs' property, resulting in diminished, if not destroyed, property value and damaging their property-related businesses.

## COUNT I
### Negligence

176.    The allegations in all previous paragraphs are incorporated by reference as though fully set forth here.

177.    TVA owed a duty to all Plaintiffs to exercise reasonable care in the construction, inspection, and maintenance of the coal ash impoundment.

946848.4

178. At all times material hereto, Plaintiffs were direct, intended and/or third party beneficiaries of, among other things, TVA's construction, inspection and maintenance of its coal ash impoundment and the proper training of its employees.

179. TVA had a heightened duty of care to all Plaintiffs because of the great danger associated with the storage of coal ash.

180. TVA breached its duty to Plaintiffs when, among other things, it failed to take appropriate steps in the construction, maintenance and inspection of the impoundment, and the proper training of its employees, in order to ensure the safety and integrity of the impoundment and to prevent the contamination of the surrounding area with toxic coal ash sludge.

181. As a direct and proximate result of TVA's failure to take appropriate steps to ensure the safety of the impoundment, Plaintiffs have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real property, lost revenue and profit, and loss of enjoyment of real property.

## COUNT II
### Gross Negligence

182. The allegations in all preceding paragraphs are incorporated by reference as though fully set forth here.

183. TVA owed a duty to Plaintiffs to, among other things, exercise reasonable care in the construction, inspection, and maintenance of the impoundment and in the training of its employees.

184. TVA had a heightened duty of care to Plaintiffs because of the great danger associated with the storage of the toxic coal ash.

185. TVA breached its legal duty to Plaintiffs by failing to exercise reasonable care, and acting with reckless, willful, and wanton disregard for the property, health and safety of others, including Plaintiffs, in the construction, inspection, and maintenance of the coal ash impoundment and in the training of its employees.

186. TVA knew or should have known that its wanton or reckless conduct would foreseeably result in the catastrophe, causing damage to Plaintiffs' property and their businesses.

187. As a direct and proximate result of TVA's reckless and wanton conduct, Plaintiffs have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real property, lost revenue and profit, and loss of enjoyment of real property.

188. TVA's wanton or reckless conduct, as described herein, entitles Plaintiffs to punitive damages.

## COUNT III
### Trespass

189. The allegations in all preceding paragraphs are incorporated by reference as though fully set forth here.

190. TVA's conduct and the resulting events described in detail in this complaint amounted to an intentional intrusion on Plaintiffs' properties.

191. TVA entered or intruded on the property of Plaintiffs without privilege, permission, invitation, or justification.

192. TVA's entry or intrusion onto the Plaintiffs' properties interfered with their right of exclusive possession of the property.

193. The entry or intrusion onto Plaintiffs' properties interfered with and continues to interfere with their exclusive possession and/or control of their property and caused, and continues to cause, harm to Plaintiffs' properties.

194. As a direct and proximate result of TVA's trespass, Plaintiffs have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution in value of real estate and/or rental value, loss of income, and loss of use and enjoyment of real property.

TVA's wanton or reckless conduct, as described herein, entitles Plaintiffs to punitive damages.

## COUNT IV
## Strict Liability

195. The allegations in all preceding paragraphs are incorporated by reference as though fully set forth here.

196. TVA's storage of toxic waste in the impoundment for decades was an abnormally dangerous and ultrahazardous activity—one which necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care and is not a matter of common usage.

197. It was inappropriate for the TVA's conduct to take place where it did.

198. TVA's conduct was uncommon or not a matter of common usage, particularly under the circumstances.

199. Even in the exercise of due care (which was not present here), the KIF dredge cells and/or impoundments were ultrahazardous.

200. TVA is strictly liable to Plaintiffs for all damages having resulted from the 12/22 disaster.

946848.4

201.    As a direct and proximate result of TVA's abnormally dangerous and ultrahazardous activity, Plaintiffs have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real property, lost revenue and profit, and loss of enjoyment of real property.

## COUNT V
### Nuisance

202.    The allegations in all preceding paragraphs are incorporated by reference as though fully set forth here.

203.    TVA's conduct has directly and proximately resulted in continuing and unreasonable interference with the use and enjoyment of properties owned by Plaintiffs and constitutes a nuisance.

204.    TVA's use of its property was unreasonable.

205.    As a direct and proximate result of TVA's conduct, Plaintiffs have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real property, lost revenue and profit, and loss of enjoyment of real property.

206.    TVA's wanton or reckless conduct, as described herein, entitles Plaintiffs to punitive damages.

## COUNT VI
### Negligence *Per Se*

207.    The allegations in all preceding paragraphs are incorporated by reference as though fully set forth here.

208.    TVA's conduct with regard to the generation, processing, storage and disposal of coal ash is governed by numerous state and federal laws and permits issued under the authority of these laws. TVA had a duty to comply with and/or assure the compliance with those

State and Federal environmental laws and regulations including, but not limited to, the

Tennessee Water Quality Control Act, T.C.A. § 69-3-101, *et seq.*; the Tennessee Solid Waste

Disposal Act, T.C.A. § 68-211-102, *et seq.*; the Tennessee Safe Drinking Water Act, T.C.A.

§ 68-221-702, *et seq.*; the Tennessee Air Quality Act, T.C.A. § 68-201-101, *et seq.*; the Federal

Clean Water Act, 33 U.S.C. § 1251, *et seq.*; the Resource Conservation and Recovery Act,

42 U.S.C. § 6901 *et seq.*; and the Federal Dam Safety Act and FEMA dam safety procedures.

209.    These laws and permits create statutory standards that are intended to
protect and benefit Plaintiffs.

210.    TVA's violations of these statutory standards constitute negligence *per se*
under Tennessee law.

211.    As a direct and proximate result of TVA's violation of the law, Plaintiffs
have suffered legal injury and damages in an amount to be proven at trial, including, but not
limited to, real and personal property damage, diminution of value of real estate and/or rental
value, and loss of enjoyment of real property.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1.    Award and enter judgment for compensatory damages (including also treble
damages where applicable) in favor of Plaintiffs and against TVA, in an amount that fairly
compensates Plaintiffs for their various damages and losses, together with interest and costs;

2.    Award and enter judgment for punitive damages in favor of Plaintiffs and against
TVA, in an amount that justly punishes TVA for its reckless, intentional, willful and/or wanton
conduct;

3.    Award reasonable attorney fees and reimbursement of costs; and,

4.    Award and/or allow Plaintiffs such other and further relief as the Court deems just

and equitable under the circumstances.

Respectfully submitted,

Dated: December 19, 2011

Elizabeth A. Alexander (BPR No. 019273)
Mark P. Chalos (BPR No. 19328)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219
Telephone: (615) 313-9000

Elizabeth J. Cabraser (*pro hac vice*)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

Wayne A. Ritchie, II (BPR No. 013936)
RITCHIE, DILLARD & DAVIES, P.C.
606 West Main Street, Suite 300
Knoxville, TN 37902-2623
Telephone: (865) 637-0661

ATTORNEYS FOR THE PLAINTIFFS

946848.4